

**FILED**
March 01, 2024 03:12 PM
ST-2023-CV-00399
**TAMARA CHARLES**
**CLERK OF THE COURT**

## IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| GLENDA WRENSFORD, MD, | ) | CASE NO. ST-2023-CV-00399 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | ACTION FOR |
| | ) | TEMPORARY RESTRAINING |
| VIRGIN ISLANDS GOVERNMENT HOSPITAL | ) | ORDER; PRELIMINARY AND |
| AND HEALTH FACILITIES CORPORATION | ) | PERMANENT INJUNCTION |
| Including Roy Lester Schneider Hospital (RLS) | ) | DAMAGES |
| CEO TINA COMMISSIONG, CMO GEORGE | ) | |
| ROSENBERG, MD, Medical Executive | ) | JURY TRIAL DEMANDED |
| Committee (MEC) Members: DENITA | ) | |
| BOSCHULTE, MD, YURI PETERKIN, MD, | ) | |
| LEROY STERLING, MD, FRANK ODLUM, MD, | ) | |
| JESSICA WILSON, MD, and | ) | |
| TAI HUNT-CEASAR, MD, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### Cite as 2024 VI Super 12

### MEMORANDUM OPINION

¶1    **THIS MATTER** is before the Court on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction filed November 10, 2023, and amended on November 15, 2023. On November 17, 2023, the Court granted a Temporary Restraining Order and enjoined the Defendants from terminating Plaintiff's employment.

¶2    The Plaintiff's Motion for Preliminary Injunction came on for hearing on December 5, 6, and 7, 2023, and thereafter the parties filed written closing arguments. Having heard evidence and considered arguments from both parties, the court will grant Plaintiff's Motion for a Preliminary Injunction and will enjoin the Hospital from terminating Wrensford. In addition, the court will order that Defendants place Wrensford back on payroll pending a formal investigation.

## SYNOPSIS

¶3    Plaintiff Glenda Wrensford, a general surgeon at the Roy Lester Schneider Hospital (RLSH), had her employment suspended and her hospital privileges revoked after she did not participate in a formal investigation following a sentinel event at the hospital.[1] Wrensford filed suit for damages and injunctive relief, seeking restoration of her hospital privileges, back pay, and compensation for uncompensated sick leave. The defendants are Virgin Islands Government Hospitals and Health Facilities Corporation (VIGHHFC), including Roy Lester Schneider Hospital, the Chief Executive Officer and Chief Medical Officer of RLSH, and members of the Medical Executive Committee. The issues are whether the medical staff bylaws empowered the president of the medical staff to suspend and/or revoke Wrensford's clinical privileges, whether the Hospital bylaws empowered the chief medical officer to suspend Wrensford, whether Wrensford was afforded due process before her hospital privileges were suspended, and whether Wrensford has a property interest in her employment and hospital privileges.

## FACTS[2]

¶4    Plaintiff Glenda Wrensford, MD ("Plaintiff" or "Wrensford") is a board-certified surgeon licensed to practice in the U.S. Virgin Islands. Wrensford has been employed with the Roy Lester Schneider Regional Medical Center ("Hospital" or "RLSH") as a general surgeon for over ten years. Approximately six years ago, she transitioned from a contract worker to a classified employee (of the Government of the Virgin Islands). Prior to the events described herein,

---

[1] "Hospital privileges" and "clinical privileges" are used interchangeably.
[2] The following facts are gleaned from evidence introduced during the Preliminary Injunction Hearing which took place on December 5, 6, and 7, 2023. The following persons were called as witnesses during the hearing: Dr. Clayton Wheatley, Jermicah Paul-Lewis, Dr. Glenda Wrensford, Vonetta Winston, Lisa Williams-Norman, Dr. George Rosenberg, Dr. Denita Boschulte, Dr. Frank Odlum, Tyshel Caines, Dr. Yuri Peterkin, and Dr. Samantha Tarshis.

Wrensford had not been subject to any disciplinary action, complaints, or findings of misconduct and was in good standing.

¶5      On May 4, 2023, Wrensford was the general surgeon on call at RLS Hospital on a regular rotation schedule. At or around 1:00 a.m., the Emergency Department ("ED") doctor on duty called Wrensford to come in to treat two gunshot victims and asked Wrensford to insert a left chest tube in one patient.  Wrensford immediately traveled to the hospital.

¶6      As standard practice, a CAT scan image of the patient was produced to verify where the chest tube placement was necessary. Relying upon this information and the CAT scan images, Wrensford confirmed that a chest tube placement was necessary on the left side of the patient because blood was appearing on the left side. A nurse said the patient had been shot on the right side. Wrensford looked at the CAT scan images and saw blood on the left and concluded that despite being shot on the right, the bullet must have crossed over to the left since blood appeared on the left side of the chest.  However, when Wrensford placed the left chest tube in the patient, she observed that the patient was not producing the expected gush of blood, but only minimal blood. Wrensford was concerned and reexamined the CAT scan images, at which point she realized that the CAT scan images were inverted – apparently by a radiology technician. This inverted placement of the images was a Sentinel Event under the Joint Commission on Accreditation of Healthcare Organizations standards and warranted review.

¶7      Wrensford realized that the patient needed a chest tube on the right. And she immediately inserted a tube on the right chest. After Wrensford notified the emergency room doctor of the error, he reviewed the original CAT scan images again and concurred the images had been inverted. Wrensford documented this error and continued to tend to the patient.

¶8    Wrensford subsequently requested that hospital staff obtain a portable connector to connect the left chest and right chest tubes to evacuate the blood. In the meantime, Wrensford provided a temporary form of suction to stabilize the patient. The patient had other serious problems, including paralysis, and needed to be stabilized as soon as possible so that he could be transported off the island for further medical treatment.

¶9    Wrensford left the hospital around 4:00 a.m. and returned at approximately 9:00 a.m. Upon her arrival, Wrensford observed that the tubes were still not connected to suction. This failure to carry out Wrensford's instructions was very concerning to her. At 10:30 a.m., the tubes were still not connected. Wrensford stressed to the staff the importance of the tubing, as the patient could not be transferred off the island without it. The daytime ER physician who had come on duty that morning said she was unaware of the need for tubing but would ensure it was done. Wrensford left the hospital at approximately 10:45 a.m.

¶10    At approximately 11:45 a.m. or noon, the ER physician called Wrensford to report the presence of a bubble in the canister attached to the chest tube. Wrensford directed her to check the chest tube, and Wrensford called Denita Boschulte, MD, President of the RLSH Medical Staff ("Boschulte")[3], to report a delay and lack of urgency in the Emergency Department in attaching the connector, which was preventing the tube from suctioning. The Chief Medical Officer, George Rosenberg MD ("Rosenberg"), was out of the office when the incident occurred. Thus, Wrensford reported her concerns to Boschulte — as she was the acting Chief Medical Officer during this time. The ER physician called Wrensford again and told Wrensford she needed to return to the

---

[3] The pleadings have various spellings of the surname of the President of the Medical Staff. But for purposes of uniformity, the court will only use the correct spelling - "Boschulte."

hospital because every time the hospital staff attempted to connect the left side suction, the patient "would scream out and holler in pain." Wrensford told the ER doctor that pain would be expected, but it would only last for 30 seconds, and then the patient would be okay.

¶11     At some point, the ER physician contacted Yuri Peterkin, MD ("Peterkin"), a radiologist and the chief of radiology at RLSH, to relay the same concerns she had expressed to Wrensford. Based on this phone call, Peterkin recommended an additional CAT scan of the patient's chest to help further identify the problem. At approximately 4:00 p.m., Peterkin called Wrensford to read her the report of the new CAT scan. He said the images depicted fluid or substance in the lungs, and the left tube was in the left thoracic cavity and likely high.

¶12     Peterkin later received another call from the ER physician inquiring whether Wrensford would be returning to the hospital. Peterkin could not give a definitive answer as to whether Wrensford would return.

¶13     When Wrensford did not immediately return to the hospital, the ER called Frank Odlum, MD ("Odlum"), the Chief of Surgery at RLSH and Wrensford's immediate supervisor. Odlum estimates he was called at approximately 3:00 or 4:00 p.m., and he arrived at the hospital at approximately 5:30 p.m. after he was finished with his office patients. Upon his arrival, Odlum found the patient stable and not in any distress. Odlum troubleshooted the patient and ensured that everything was appropriately set up; he moved the tubes from the portable suction and connected them to wall suction. Odlum described the patient as "fine" and not suffering any discomfort. Since the contact with the patient was so minimal, Odlum did not record any of this in the patient chart.

¶14    Unaware Odlum had been called to the hospital, Wrensford returned to the hospital at approximately 7:00 p.m. to check on the patient and observed the chest tubes had been properly connected and suctioned.

¶15    The following day, on May 5, 2023, several medical staff, including Wrensford, attended a Root Cause Analysis Meeting ("RCA") to discuss the events of May 4. At least eight persons, including Wrensford, attended the RCA. Generally, an RCA is conducted shortly after a sentinel event at the hospital.[4] An RCA is a collaborative event that is typically conducted to help the hospital staff prevent another similar event, incorporate helpful solutions moving forward, and is not punitive or cast blame. During the RCA, Wrensford explained the events of the previous day. However, the meeting, in Wrensford's words and unrebutted, became a "free for all" where at least two attendees repeatedly yelled at Wrensford that she did not immediately return to the hospital when called. That action caused Wrensford to conclude that her concerns regarding the inverted images, the inability to timely locate the requested medical equipment, and the failure to properly connect the tubes were not being properly considered nor appropriately addressed.[5]

¶16    Following the RCA, on May 15, 2023, Boschulte sent a formal letter to Wrensford to set up a professional peer review meeting, which is standard in the medical industry.[6] The letter outlined that the Medical Executive Committee ("MEC") determined that a collegial intervention, as permitted under the Medical Staff Bylaws, Article VI, Part A, Sections 1.1-3.1, was appropriate to address the placement of a chest tube on the incorrect side of a patient and to address

---

[4] A sentinel event "is an event so out of the norm that it warrants the medical staff examining the event and what steps to take next to prevent it." The parties stipulated that the placement of tubes on the wrong side of a patient is a sentinel event.

[5] No formal minutes were provided after the meeting.

[6] Pl.'s Ex. No. 10.

Wrensford's refusal to respond to the ED physician's request to re-evaluate the patient after expression of serious concerns for the patient's wellbeing.[7]

¶17    On the morning of May 22, 2023, Wrensford, Boschulte, and Peterkin arrived to attend the peer review meeting. Wrensford inquired about having an administration employee present at the meeting to keep minutes. Boschulte and Peterkin responded that recording or keeping minutes is not standard practice. Upon hearing no minutes were going to be created, Wrensford inquired whether anyone would be taking notes and producing minutes for the meeting. Boschulte again stated that no one would be present to take formal minute meeting notes. However, Boschulte offered Wrensford the opportunity to record the meeting on her phone and then produce formal minutes from the recording. Dr. Wrensford declined this offer since it would not be official minutes because she was aware that the results of a collegial intervention could be placed in a physician's personnel file. Wrensford informed Boschulte and Peterkin she would only participate when someone was present to take official minutes, and Wrensford left the meeting.  The gathering was over in less than 2 minutes.

¶18    Subsequently, on or about June 2, 2023, the Chief Medical Officer ("CMO") of the hospital, George Rosenberg, MD and Odlum met with Wrensford, as the CMO wanted to sit and chat with Wrensford to hear her perspective about the events of May 4, so he could better understand what had occurred. Rosenberg was unaware an RCA meeting had already taken place. Wrensford described to Rosenberg the lopsided tenor of the RCA meeting. And instead of a chat with Rosenberg about the events of May 4, Wrensford expressed to him that she would prefer to pull the patient's record and chart and provide a written synopsis. Rosenberg agreed, and

---

[7] The meeting was originally scheduled for May 19, 2023, but moved to May 22, 2023.

Wrensford promised to submit her report the following Monday. Rosenberg responded that he was okay with a written version and asked that Wrensford submit the report by midweek.

¶19    But on June 8, 2023, Boschulte wrote to Wrensford, recapping the failure to conduct a proper collegial meeting on May 22, noting concerns about Wrensford's ability to work harmoniously with others, and stated that after consultation with Rosenberg and Dr. Olivacce, Chief of Nursing, and in keeping with Wrensford's request for a more formal process, the MEC had decided to initiate a formal investigation pursuant to Article VI, Part B, Section 2A of the Medical Staff Bylaws.[8] The letter also stated that a three-person ad hoc investigating committee would be appointed to conduct the formal investigation. Boschulte's letter explained that under the SRMC Medical Staff Bylaws, one person is appointed by the MEC, one person is appointed by the Chief Medical Officer ("CMO"), and one person is appointed by the person being investigated – in this case, Wrensford. The Medical Bylaws provide that once all members are appointed to the ad hoc committee, the investigating committee is expected to complete and issue a report within thirty days. Pursuant to the Medical Staff Bylaws, the findings and recommendations of the ad hoc committee are then sent to the Board through the CMO for a final decision on whether to accept the committee's proposal.[9] Boschulte concluded the letter by giving Wrensford a deadline of June 16, 2023, to submit a recommendation for a committee member. Wrensford testified that she was happy to receive this letter and the formal investigation because it would end the informality of meetings without minutes. Given that the MEC was initiating a

---

[8] Pl. Ex. 3
[9] SRMC Medical Staff Bylaws, Article VI, Part B, Section 4. Pl.'s Ex. 3.

formal investigation and the letter said they had consulted with Rosenberg, Wrensford believed delivering the written report to Rosenberg was no longer necessary.

¶20    The  portion of the Medical Staff Bylaws that provides for the formal investigation and a three person ad hoc committee states that the ad hoc committee shall not include partners, associates or relatives or competitors of the Member being investigated, but it may include persons not on the Medical Staff.[10] Wrensford could not find a professional to appoint to the ad hoc committee who possessed similar subject matter knowledge and experience in responding to trauma in the emergency room who was not her partner, associate, relative, or competitor. On June 16, Wrensford emailed Boschulte communicating the difficulty Wrensford was experiencing in appointing a member to the ad hoc committee by the requested deadline. Wrensford instead requested that an external review be conducted "to ensure a comprehensive objective analysis." Her request for an external review arose from concerns that any internal investigation would not be free of bias.

¶21    Before the ad hoc committee was formed, Wrensford received a letter from Rosenberg placing her on an eight-week suspension.[11] The letter stated that not having received Wrensford's report, Rosenberg was left with no choice but to base his evaluation on the accounts provided to him by the other physicians and nurses who cared for the patient on May 4. The letter said that Wrensford's failure to return to the hospital constituted patient abandonment, and her lack of responsiveness to the call for help from the ER physician was an abdication of her duty that subjected her to discipline. He concluded by saying that due to "your unacceptable patient care,

---

[10] SRMC Medical Staff Bylaws, Article VI, Part B, Section 3(a). Pl. Ex. 3.
[11] Rosenberg's letter was dated June 16 and delivered on June 20, 2023. Pl. Ex. 10. The letter states the suspension was approved by the Chief Executive Officer of RLSH.

lack of collegiality, and insubordination, I am suspending you for a period of eight weeks without pay." The eight-week suspension without pay began effective immediately and was set to end on August 13, 2023. Through her union, Wrensford filed a union grievance to challenge the suspension, as she had not received any advance notice that failure to submit a written report would result in a suspension.[12]

¶22     The day after Wrensford received notice of an eight-week suspension, Boschulte emailed Wrensford to follow up on Wrensford's duty to name a representative to the ad hoc committee and extended the deadline to June 23, 2023, for Wrensford to name someone to the ad hoc committee. Boschulte further stated that if Wrensford failed to meet the deadline, a member would be appointed for her. Boschulte clarified that the investigation would not address Wrensford's technical abilities as a surgeon but would be limited to Wrensford's response to the hospital staff's request for Wrensford to return to the emergency room. Boschulte suggested Wrensford consider someone in the surgical/technical field, such as ophthalmology, orthopedics, or urology, or one from any other medical field.[13]

¶23     Wrensford replied to Boschulte by stating that her request for an external review still stands because of bias concerns since she had already been suspended. Wrensford did not appoint any professional to the ad hoc committee by the June 23 deadline, nor later. But, the MEC did not appoint anyone to the committee on Wrensford's behalf. Nor did the MEC formal investigation occur, as the MEC determined that the Medical Bylaws did not give the MEC the authority to appoint a member to the ad hoc committee on Wrensford's behalf.

---

[12] The grievance remains pending.
[13] Plaintiff's Ex. No. 14.

¶24    On August 3, 2023, Boschulte sent a formal letter to Wrensford to advise her the medical staff denied the request for an external review because the Bylaws require a member first be appointed to the ad hoc committee, and then the ad hoc committee could initiate an external review. The letter further stated that because of Wrensford's failure to nominate a member to the ad hoc committee, her hospital privileges were voluntarily suspended, pursuant to the Medical Staff Bylaws Article VI, Part D, Section 3.[14] Suspension of Wrensford's hospital privileges meant that she could not treat patients at the hospital.[15] And Wrensford was thus unable to work at RLSH.

¶25    On September 14, 2023, Rosenberg requested that Wrensford provide notice regarding the date she intended to return to work.[16] She did not respond.

¶26    On October 2, 2023, Rosenberg wrote to Wrensford stating that the delay in providing her return to work date was untenable and gave her seven days to return but two days to give notice of her return date, failing which she would be subject to dismissal under Administrative Rules and Regulations Section 10.6 Item 21.[17] On October 3, 2023, Wrensford submitted a letter from her physician, which stated Wrensford was under his care, unable to return to work at that time, and would be reevaluated on November 2, 2023. Wrensford sent this letter to HR, Dr. Odlum, and several others, but she received no response to the letter.

¶27    On November 3, 2023, Wrensford's physician sent a letter to RLS hospital stating she was cleared to return to work on Monday, November 6, 2023. On November 14, the Chief Executive

---

[14] Plaintiff's Ex. No. 16.

[15] Wrensford was not paid during the suspension period, not even for sick leave after the suspension period had expired. Defendants contend that Wrensford did not complete the necessary leave slip for sick leave. However, the sick leave issue is one of damages; therefore, the court need not address it in this opinion determining if preliminary injunction should be granted.

[16] Pl.'s Ex. 19.

[17] Pl.'s Ex. 20.

Officer for RLS, Tina Comissiong, Esq. MPA ("Comissiong") sent a letter to Wrensford stating that she was scheduled to resume on-call work as a general surgeon on November 20, 2023, on the condition that active medical staff privileges were in place. Comissiong's letter further stated that failure to have active medical staff privileges by the November 20 return date meant Wrensford's employment would be permanently terminated.

¶28    On November 17, 2023, Boschulte wrote to Wrensford to advise her that her failure to appoint a member to the ad hoc investigating committee resulted in her automatic resignation from the Medical Staff.[18] Before the deadline in Comissiong's letter lapsed, Wrensford filed this lawsuit on November 10, 2023, seeking a Temporary Restraining Order, Injunctive Relief, and Damages.

¶29    The Court granted the Motion for TRO in part, prohibiting the Hospital from terminating Wrensford, and an evidentiary hearing on the Motion for Preliminary Injunction was held on December 5, 6, and 7, 2023. Both parties requested an opportunity to file written closing arguments and agreed to the extension of the temporary restraining order to accommodate that briefing schedule.

## STATUTORY STRUCTURE OF RLS HOSPITAL
## AND ASSOCIATED BYLAWS AND REGULATIONS

¶30    Defendant Virgin Islands Government Hospitals and Health Facilities Corporation (VIGHHFC) is a public entity that has jurisdiction over the territory's hospitals, including RLSH, and all personnel and equipment associated therewith. V.I. C. 19 § 245(a) and (c). VIGHHFC has a duty to "maintain a system of personnel administration based on merit principles, equal opportunity and treatment and scientific methods governing the appointment, promotion, transfer,

---

[18] Pl. Ex. 25.

layoff, removal and discipline of hospital officers and employees." 19 V.I.C. § 245(e)(1). The Chief Executive Officer of RLSH "shall appoint and remove all managerial personnel, health care providers and all other professional and nonprofessional personnel, subject to the provisions of Title 3, … Section 530 relating to procedures for employee dismissals, demotions and suspensions …" 19 V.I.C. § 244a(a)(b). And Section 530 of Title 3 provides that before the Hospital can dismiss, demote or suspend a regular employee the CEO must first furnish the employee with a written statement of the charges against the employee.

¶31 In addition, VIGHHFC has a duty to "comply with the laws, rules and regulations, and procedures of the Government of the Virgin Islands as applicable, and most particularly with respect to employees, and abide by collective bargaining agreements applicable to the Government employees subject to supervision by the corporation." 19 V.I.C. § 246(c). Further, VIGHHFC shall "…have those powers and duties expressly provided by law and no others." 19 V.I.C. § 243.

¶32 The Medical Staff at RLS Hospital is organized under the St. Thomas & St. John District Governing Board of the V.I. Government Hospitals and Health Facilities Corporation ("Board"),[19] as authorized by 19 V.I.C. §§ 244(c) and 245(e)(3).

¶33 Three different sets of Bylaws for RLS Hospital are implicated and discussed in the instant case: By-Laws, Rules and Regulations of the St. Thomas St. John District Governing Board, The Virgin Islands Government Hospital and Health Facilities Corporation (Pl.'s Ex. 1), Human Resource Department: Administrative Policy and Procedure Manual (Pl.'s Ex. 2), and Schneider Regional Medical Center: Medical Staff Bylaws (Pl.'s Ex. 3).

---

[19] Pl's Ex. 3. Page 5. Medical Staff Bylaws - Preamble, Pg. 5: "[T]he medical staff is a component of the hospital corporation and must work with and *is subject to the ultimate authority of the Board of Directors . . . .*") (alteration in original) (emphasis added).

## DISCUSSION

### A. Motion for Preliminary Injunction

¶34     Virgin Islands Rule of Civil Procedure 65 provides the legal standard for a ruling on a preliminary injunction. When deciding whether to grant or deny a preliminary injunction, Virgin Islands courts shall consider the following four factors:

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*Yusuf v. Hamed*, 59 V.I. 841, 847 (V.I. 2013) (citing *Petrus v. Queen Charlotte Hotel Corp.*, 56 V.I. 548, 554 (V.I. 2012) (quoting *Iles v. de Jongh*, 638 F.3d 169, 172 (3d Cir. 2011)). A preliminary injunction is an "extraordinary and drastic remedy" and is "never awarded as of right, but only 'upon a clear showing that the plaintiff is entitled to such relief.'" *Bassil v. Klein*, 75 V.I. 19, 27 (V.I. Super. Ct. 2021) (citing *Yusuf*, 59 V.I. at 847 (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).

¶35     The courts shall apply "a variation of the sliding-scale test" when analyzing the four preliminary injunction factors. *3RC & Co. v. Boynes Trucking Sys.*, 63 V.I. 544, 553 (V.I. 2015) (citing *SBRMCOA, LLC v. Morehouse Real Estate Invs., LLC*, 62 V.I. 168, 186 (V.I. Super. Ct. 2015)). Under the sliding-scale approach, no single factor is dispositive. *3RC & Co.*, 63 V.I. at 544.

1. **Reasonable Probability of Success on the Merits**

¶36 A reasonable probability of success on the merits is shown if a party demonstrates "a reasonable chance, or probability, of winning." *Yusuf*, 59 V.I. at 849 (citing *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011)). The movant of the preliminary injunction need only show that success on the merits is "more likely than not" rather than whether it will actually prevail on the merits. *Id.* Although "a jury will ultimately determine the factual issues presented in the case," the Court shall make a finding of fact when considering a preliminary injunction. *Bassil*, 75 V.I. at 28 (citing *Yusuf*, 59 V.I. at 853). The burden is on the movant to provide evidence supporting each element of the cause of action. *Advanced Surgical v. Cintron*, 2017 V.I. Lexis 63, * 31 (V.I. Super Ct. 2017) (citing *Punnett v. Carter*, 621 F.2d 578, 583 (3d Cir. 1980)).

¶37 Courts shall consider the movant's likelihood of success on the merits in conjunction with the claim of injury. *Bassil*, 75 V.I. at 28 (*see 3RC & Co.*, 63 V.I. at 555 (quoting *Commonwealth v. Cnty. of Suffolk*, 383 Mass. 286, 418 N.E.2d 1234, 1235 (1981)). In certain cases, courts can permit a preliminary injunction if a moving party demonstrates a strong probability of success on the merits, even if the irreparable harm factor is less sound. *Bassil*, 75 V.I. at 28-29. By extension, a court may also conduct a similar evaluation if the "risk of irreparable harm to moving party is substantial, and the likelihood of success on the merits may be weaker." *Id.* (citing *3RC & Co.*, 63 V.I. at 556 (citing *D.C. v. Greene*, 806 A.2d 216, 223 (D.C. 2002)).

i.        Violation of Hospital Bylaws

¶38     Relying on the Board of Director Bylaws, Wrensford argues that the President of the Medical Staff did not have the authority to revoke Wrensford's hospital privileges, as the MEC's authority is limited by the Board's Bylaws. Wrensford asserts that the President of the MEC acted outside the scope of authority in revoking Wrensford's hospital privileges and terminating her Medical Staff appointment without first making a recommendation to the Board.

The bylaws of the Hospital specifically state,

"While the Board shall delegate to the Medical Staff the authority to evaluate the professional competence of its member physicians and dentist . . . *it shall hold the Medical Staff responsible for making recommendations to the Board concerning initial staff appointments, reappointments, and the granting, curtailment, suspension, or revocation clinical privileges.*"

(alteration in original) (emphasis added).[20]

¶39     The Hospital's bylaws further state,

"Refusal, Termination, or Suspension of Appointment to the Medical Staff or Privileges thereon: Consistent with the foregoing provisions, any appointment to the Medical Staff may be terminated and any clinical privileges accorded to members of the Medical Staff may be curtailed or revoked by the Board prior to the expirations of the period for which such appointment was made or such clinical privileges granted."[21]

¶40     In addition, Plaintiff argues that the bylaws do not provide for the voluntary suspension of clinical privileges for the failure to appoint someone to the ad hoc committee, not even by the

---

[20] Article IV, Section 5(h). Pl. Ex. 1.  Page 5.
[21] Article XI, Section 8(b). Pl Ex. 1. Page 31.

Board. In suspending Wrensford's clinical privileges, the President of the Medical Staff relied upon Article VI, Part D, Section 3 of the Medical Staff Bylaws. That section provides:

> "If at any time a Member fails to provide requested information pertaining to patient care issues, peer review activities, and/or qualifications for appointment or maintaining Clinical Privileges (including but not limited to information related to automatic relinquishment of privileges and/or physical or mental examination reports as specified elsewhere) pursuant to a formal request by the Credential Committee, the MEC, the Board, any other committee engaged in peer review or the Chief Medical Officer, the Member's Clinical Privileges shall be deemed to be voluntarily suspended until the required information is provided to the satisfaction of the requesting party."[22]

¶41    However, that section falls in a category that addresses failure to complete medical records or utilize electronic medical records, loss of medical license, loss of member's DEA controlled substance authorization, failure to comply with the medical malpractice insurance coverage, and professional liability and/or a criminal conviction. The court finds that nothing within Article IV, Part D is pertinent to failing to name a member to an ad hoc committee, as failing to name someone to an ad hoc committee cannot be deemed a failure to provide requested information for any of the identified subject matters.

¶42    The Hospital Bylaws do not grant the MEC or its president the authority to suspend the physician's medical privileges for failing to name a person to the ad hoc committee. Moreover, the court finds that nothing within any of the Bylaws grants the president of the Medical Staff the authority to suspend a physician's clinical privileges.

---

[22] Pl. Ex. 3. Page 34.

¶43    Wrensford's Notification of Personnel Action ("NOPA") was signed by RLSH's Chief Executive Officer, Chief Financial Officer, and Director of Human Resources.[23] In addition, Wrensford's August 30, 2013, employment offer was signed by both the Interim Chief Executive Officer and the Chairperson of Schnieder Regional Medical Center Board of Trustees.[24] Finally, Wrensford's biennial re-appointment to the medical staff was approved by the Chairperson of the Hospital Board of Trustees, the Chairperson of the Credential Committee, and the Chairperson of the Executive Committee.[25] The language in the Bylaws, coupled with the evidence relating to Wrensford's hiring process and re-appointment credentialing approval leads the court to arrive at the conclusion that, similar to the hiring authority, the authority to revoke clinical privileges and staff appointments is not within the control of the MEC President.

¶44    Although the Hospital began the formal investigatory process whereby a physician's privileges or staff appointment can be revoked, the MEC was only responsible for making a recommendation to the Board for a final decision. Based upon the foregoing, Wrensford has demonstrated a reasonable probability of success in her claim that the President of the MEC acted without lawful authority in suspending Wrensford's clinical privileges.

¶45    Moreover, the Medical Staff Bylaws that provide for the ad hoc committee state the committee *should* consist of three persons. Thus, the reference to a three-person committee was not mandatory. Therefore, when Wrensford did not name someone to the ad hoc committee, the committee of two had the right to consider the matter and proceed in accordance with the bylaws.

---

[23] Pl.'s Ex. 6.
[24] Pl.'s Ex. 5.
[25] Pl.'s Ex. 30.

¶46     The November 17, 2023, letter from the president of the medical staff advising Wrensford that her appointment on the Medical Staff was automatically suspended for failing to appoint someone to the ad hoc committee[26] was similarly issued without authority. The letter cited Medical Staff Bylaws Article VI, Part D, Section 2D, which provides that at the conclusion of the investigation, the MEC has several different actions it may recommend, including the reduction or restriction of clinical privileges or that clinical privileges be suspended for a term. It also provides that the MEC could recommend that medical staff appointment and/or clinical privileges be revoked. (emphasis added).[27]  Those Medical Staff Bylaws also state that any recommendation by the MEC that would entitle the member to request a hearing shall be forwarded to the CMO who shall give notification to the employee, and then the CMO shall forward the matter to the Board with a recommendation and all supporting information.[28] So, not only did the president of the medical staff not have authority to voluntarily suspend, she did not have authority to automatically suspend Wrensford's clinical privileges.[29]

¶47     The parties presented no evidence that even suggests the MEC made a recommendation to the Board, nor advised the Board that Wrensford's hospital privileges were voluntarily suspended and that Wrensford was deemed to have automatically resigned her appointment to the medical staff.  Therefore, Wrensford has demonstrated that she has a reasonable degree of success in her claim that the MEC violated the Hospital Bylaws by independently suspending Wrensford's privileges and membership on the Medical Staff.

---

[26] Pl.'s Ex. 25.
[27] Pl. Ex 3.
[28] Medical Staff Bylaws Article VI, Part B, Section 4(C).
[29] Medical Staff Bylaws Article VI, Part B, Section 4(D).

ii. Due Process

¶48 The Due Process Clause of the Fourteenth Amendment prohibits government interference in an individual's property interests without due process of the law. U.S. CONST. amend. XIV. The Due Process Clause is made applicable to the Virgin Islands pursuant to § 3 of the Revised Organic Act. *Richards v. People*, 53 V.I. 379, 384 n.2 (V.I. 2010) (citing Revised Organic Act of 1954, § 3, 48 U.S.C. § 1561).

¶49 In considering a procedural due process claim, the plaintiff must show "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law." *Iles*, 638 F.3d at 173. Defendants argue there is no constitutional guarantee of an established right to continued employment. However, determining "whether an employee has a property right in continued employment is a question of state [or territorial] law." *Georges v. Gov't of the Virgin Islands*, 2021 VI Super 84U, *16-17 (citing *Iles*, 638 F.3d at 173)).

*A. Property Interest in Employment*

¶50 A regular government employee, as defined in Title 3 of the Virgin Islands Code, has a statutorily protected property interest in their employment. *Fleming v. Cruz*, 62 V.I. 702, 715 (V.I. 2015) and Title 3 V.I.C. § § 530(a)(1) and 530(a)(2)(C), (S*ee also Iles*, 638 F.3d at 230). Therefore, Wrensford, as a regular employee, has a protected property interest in her employment. Title 3 V.I.C. §§ 530(a)(1) and 530(a)(2)(C).[30] Virgin Islands law requires that before the head officer of any agency (including a hospital under the jurisdiction of the VIGHHFC) dismisses, demotes, or

---

[30] None of the parties dispute that Wrensford is a regular employee.

suspends a regular employee of a department or agency, the head officer (in this case, the CEO of RLSH) shall furnish the employee with a written statement of the charges against her and the employee has ten days to appeal. Title 3 V.I.C. § 530(a)(2)(C). In addition, the Hospital bylaws and Human Resources Manual specify that an employee is entitled to notice and a hearing before they are terminated.[31,32] This has not occurred.[33] Therefore, Wrensford is entitled to a preliminary injunction enjoining the Hospital from terminating her.[34] In addition, Wrensford's last reappointment to the Medical Staff occurred on August 6, 2022, and is due to expire on August 5, 2025.[35] This strengthens the finding that Wrensford has a property interest in her employment.

---

[31] Medical Staff Bylaws, Article II, Section 1.1, 1.1.4: "Prerogative: Appointees to this Active Category may: *Be terminated by the Board upon recommendation of the MEC* and effective immediately there will be appropriate attempts of Notification to the affected Active Staff Member. This will be subject to any hearing or appeal rights set forth elsewhere in these Bylaws and in the Medical Staff Investigation, Corrective Action, Hearing and Appeal Plan Policy." (emphasis added); *See also* Article II, Section 1: The Active Category: "Qualifications: Appointees to this category must have served on the Medical Staff for one (1) year and complied with the Minimum Utilization Criteria." Pl. Ex. 3.

[32] Human Resources Departments: Administrative Policy and Procedure Manual, Section 10.2: "Whenever suspension, or a discharge is recommended, the division head and the Human Resource Director shall promptly conduct an investigative hearing and immediately after the hearing submit reports of findings and recommendations to the Chief Executive Officers through the Human Resource Director. The Chief Executive Officer shall make the final decision on disciplinary action against the employee. The employee shall be furnished a letter specifying the disciplinary action being taken and the reasons therefore."; Section 10.5(B): "In the case of discharge, prior to a formal notice of dismissal, the Chief Executive Officer or a designee will conduct a hearing of the charges." Pl.'s Ex. 2.

[33] Certainly, Wrensford received notice regarding the ad hoc committee, and she refused to participate. But that process did not involve her employment, despite the obvious intertwining of her clinical privileges and employment.

[34] Although Wrensford has not been terminated from her employment, it is only the temporary restraining order that saved her from that fate, as the CEO issued a letter threatening termination just a few days before the court entered the temporary restraining order prohibiting the Hospital from terminating Wrensford. Had the court not acted when it did, Wrensford would have likely been terminated.

[35] Pl. Ex. 30.

### B. Property interest in clinical privileges.

¶51    Wrensford claims a property interest in her clinical privileges. Wrensford testified that since the suspension of her privileges, she has been unable to return to work on the general surgery call rotation at RLSH and treat patients since the start of her eight-week suspension and revocation of clinical privileges.[36] Without her clinical privileges, Wrensford is prohibited from treating patients. In fact, the CEO's letter to Wrensford, warning her of potential termination, stated, "As you know, you are required to have active medical staff privileges in order to practice medicine as a general surgeon at SRMC."[37] As a result, Wrensford is unable to fulfill any of her job duties as a general surgeon at RLSH without clinical or medical staff privileges, which clearly demonstrates that Wrensford's hospital privileges are wholly interwoven with her employment at RLSH. In addition, the Medical Staff and Hospital Bylaws require that the MEC adhere to a series of procedural steps, including making a recommendation to the Board, prior to termination of a physician's privileges.[38] Since the Bylaws require a formal investigatory process and opportunity for a hearing before the suspension of privileges, and Wrensford's clinical privileges are interwoven with her employment, the court finds that Wrensford has a property interest in her clinical privileges.

   *a.  Notice and Hearing*

---

[36] Pl.'s Ex. 17.

[37] Pl.'s Ex. 26.

[38] Pl.'s Ex. 3 (quoting Medical Staff Bylaws – Article VII – Part A: Initiation of Hearing (A) " . . . [A] Medical Staff Member shall be entitled to request a hearing whenever one of the following recommendations has been made by the MEC or the Chief Medical Officer: (3) Revocation of Medical Staff Appointment; (6) Suspension of Clinic Privileges for more than (14) fourteen days (other than precautionary suspension); *see also* Article VI, Part B: Investigations).

¶52    The Due Process Clause requires that an individual receive proper notice and hearing before depriving that individual of a protected interest. *Cleveland Board of Education v. Loudermill*, 470 U S 532, 543-544 (1985) (citing *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).

¶53    Wrensford argues that the Hospital disregarded her due process protections by not providing adequate notice and hearing. The Hospital counters that Wrensford was given notice of the charges against her several times through a series of communications reminding her to appoint someone to the investigative committee. In addition, the Hospital argues that Wrensford had an opportunity to be heard at the RCA, the Collegial Intervention, and by providing Rosenberg with her written account of the May 4 events. Thus, the Hospital asserts Wrensford had several opportunities to explain her version of events, and particularly, the chance to explain why she did not immediately return to the hospital on May 4.[39]

¶54    The court agrees that Wrensford received several notices requesting she appoint someone to the ad hoc investigative committee. But Boschulte failed to communicate to Wrensford that her privileges would be suspended as a consequence of failing to assign someone to the investigative committee. In fact, Boschulte communicated in writing to Wrensford on June 21, 2023, that her failure to appoint someone to the investigatory committee would result in Boschulte appointing someone on her behalf.[40] In response, Wrensford stated she was unsuccessful in finding someone to qualify in reviewing her case. Boschulte never appointed a person for Wrensford and testified that she subsequently determined she had no authority, under the Medical Staff Bylaws, to appoint

---

[39] This court has no opinion on whether Wrensford had a duty to immediately return to the hospital when called on the afternoon of May 4.
[40] Pl.'s Ex. 14.

someone to the committee on Wrensford's behalf. Boschulte first informed Wrensford in a phone call conversation on August 2, 2023, that her hospital privileges would be suspended if Wrensford did not name someone to the ad hoc investigative committee. The following day, Wrensford's hospital privileges were "voluntarily suspended." However, the court is not persuaded that one phone call rises to the level of adequate notice under the Due Process Clause, particularly because it was provided only one day before Wrensford's clinical privileges were suspended. Furthermore, even if the notice was sufficient, the president of the medical staff had no authority to terminate Wrensford's clinical privileges.

¶55    The court finds that Boschulte was correct in determining that the ability to initiate an outside formal investigation was dependent upon the formation of the ad hoc committee.[41] However, the bylaws only state that the ad hoc committee *should* consist of three persons. In other words, the bylaws do not require a committee of three people. Once Wrensford declined to participate, the committee had the right to proceed and refer the matter for an outside investigation if it so desired. There is no doubt that Wrensford's predicament is partially self-inflicted by failing to accept a phone recording at the attempted collegial intervention meeting on May 22, 2023, demanding formality, and then refusing to participate in a formal investigation under the Medical Staff bylaws to which she is bound. Nonetheless, nothing within the bylaws authorized the

---

[41] Article VI, Part B provides "Investigations, Section 3(B): An outside consultant or agency may be used whenever a determination is made by *the Hospital and the investigating committee* that: (1) the clinic expertise needed to conduct the review is not available on the Medical Staff, or (2) the Member under review is likely to raise, or had raised, questions about the objectivity of other Members on the Medical Staff (whether or not such questions have merit); or (3) the Members with the necessary clinical expertise on the Medical Staff would not be able to conduct a review without risk of allegations of bias, even if such allegations are unfounded." (emphasis added). Pl.'s Ex. 3.

President of the Medical Staff to voluntarily suspend Wrensford's hospital privileges without Board approval.

¶56    Moreover, the court received no evidence that Wrensford received any notice prior to November 17, 2023, that she was going to be deemed to have automatically resigned her Medical Staff appointment for not appointing a member to the investigative committee.[42]

¶57    Separately, the court notes that Wrensford had notice and an opportunity but refused to participate in the Collegial Intervention because no administrative person would be present to take formal minutes. But refusal to participate in a Collegial Intervention under the Medical Staff Bylaws only permits the MEC to initiate a formal investigation, not to suspend her hospital privileges.[43] The court finds it understandable that Wrensford never provided a written report to Rosenberg because Boschulte's June 8, 2023, letter to Wrensford stated that, after consultation with Rosenberg, a formal investigation was being initiated.[44] Certainly, this led Wrensford to believe that Rosenberg was aware of the formal investigation. Why Rosenberg would still expect a report from Wrensford is unknown. But the court hastens to add that the parallel tracks of sanctions associated with employment and sanctions associated with clinical privileges can certainly be confusing for a member of the medical staff with clinical privileges, especially since clinical privileges are interwoven with employment, and Wrensford could not work without both.[45]

---

[42] Pl.'s Ex. 25.

[43] Pl.'s Ex. 3 (citing Medical Staff Bylaws Article VI, Part B, Section 1(a) and 2(a)); *see also* Pl.'s Ex. 11.

[44] Pl.'s Ex. 11 (quoting the June 8, 2023, letter: "As the MEC, we have made sufficient inquiry and have reviewed the matter with [Rosenberg] (ICMO) . . . [a]s per your request for a more formal process and in recognition of the Bylaws . . . the MEC met for an executive session on Friday May 26, 2023, and we have decided to initiate a formal investigation.") (alteration in original).

[45] Despite the purported failure of Wrensford to tender her report to the Chief Medical Officer, there was no authority for the Chief Medical Officer to subject her to an eight-week suspension because she was entitled to a hearing pursuant to Human Resources Department: Administrative Policy and Procedural Manual, Section 10.4(B). In addition, the maximum suspension under the bylaws is 30 days under the Human Resources Department: Administrative Policy

¶58    In addition, Boschulte suspended Wrensford's clinical privileges without first making a recommendation to the Board as required by the Board of Director Bylaws.[46] The MEC's course of action did not provide Wrensford with adequate notice or hearing before revoking her privileges and Medical Staff appointment. Depriving Wrensford of her property interest in clinical privileges without proper notice and hearing violates the due process clause. In doing so, the Court finds that Wrensford has demonstrated a reasonable probability of success on the merits of her denial of due process claim.

### 2. Irreparable Harm

¶59    Irreparable injury or harm is the "certain and imminent harm for which a monetary award does not adequately compensate." *Yusuf*, 59 V.I. at 854 (citing *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir. 2003)). While considering the preliminary injunction factors, irreparable harm "is the primary factor a moving party must demonstrate in order to succeed on a motion for a preliminary injunction." *Bassil*, 75 V.I. at 29 (citing *3RC & Co.*, 63 V.I. at 554).

¶60    To prove the irreparable harm factor, Wrensford must show that monetary damages are either "difficult to ascertain or are inadequate." *Gourmet Gallery Crown Bay, Inc. v. Crown Bay Marina, L.P.*, 68 V.I. 584, 597 (V.I. 2018) (citing *Yusuf*, 59 V.I. at 854) (quoting *Danielson*, 479 F.2d at 1037). The moving party fails to establish the irreparable harm necessary to succeed on a

---

and Procedural Manual, Section 10.4(A), Pl.'s Ex. 2. Even the Medical Staff Bylaws, Article VI, Part D. Section 5(A), Pl.'s Ex. 3, limits the suspension to 29 days.

[46] Article IV, Section 5(h) Duties, Powers, and Restrictions of individual Directors and the Board: "While the Board shall delegate to the Medical Staff the authority to evaluate the professional competence of its member physicians and dentist . . . *it shall hold the Medical Staff responsible for making recommendations to the Board* concerning initial staff appointments, reappointments, and the granting, curtailment, suspension, or revocation clinical privileges.") Pl.'s Ex. 1 (alteration in original) (emphasis added).

preliminary injunction if the loss "is a matter of simple mathematic calculation." *Id.* (citing *Yusuf*, 59 V.I. at 854) (citations and internal quotation marks omitted). Finally, the irreparable harm must be imminent. *Id.*

¶61    Wrensford argues that terminating her employment at RLSH would severely impact her ability to remain and practice in the Virgin Islands, which has been her home for many years. Wrensford further claims that the report to the National Board concerning her loss of privileges will result in reputational damage and significantly limit her ability to find employment outside the Virgin Islands. The Hospital points out it is statutorily required to report the revocation of Wrensford's privileges, and it argues Wrensford was given proper notice and hearing to address the charges against her.[47] In addition, the Hospital points out that Wrensford was offered the opportunity to reapply for her privileges.

¶62    RLSH is the only hospital located on St. Thomas. If the court denies the motion for preliminary injunction, Wrensford will be unable to practice her profession in the Virgin Islands. And the intangible cost of a non-voluntary move off-island cannot be calculated. Further, any effort by Wrensford to relocate and apply for positions outside the Virgin Islands is significantly complicated by the report to the National Board. Wrensford's liberty interest may also be impacted if certain hospitals refuse to hire Wrensford based on the National Board report generated by a wrongful suspension of clinical privileges based upon concerns about Wrensford's ability to work

---

[47] Although the Defendants make this argument, the court notes that those arguments are more applicable to the success on the merits element of a preliminary injunction ruling than the element of irreparable harm. *See* Defs.'s Closing Arg. 15-16: "Dr. Boschulte testified that plaintiff Wrensford was not barred from re-applying for her privileges. Additionally, Plaintiff's claim of damage to her reputation based on the hospital's statutory ability to report does not constitute irreparable harm because she was provided notice and opportunity to be heard regarding the charges against her and repeatedly chose not to avail herself of the process."

harmoniously with others. The court has no opinion on whether Wrensford had a duty to quickly return to the hospital on the afternoon of May 4 but notes that Odlum, the Chief of Surgery and Wrensford's supervisor, completed his private office duties before reporting to the hospital almost 1.5 hours after he was called. His treatment of the patient was so insignificant that he did not record his actions in the patient's chart. Moreover, Boschulte's letter of May 15, which advised Wrensford of the Collegial Intervention, also stated, "the Medical Executive Committee has met, and it has been determined that the clinical assessment of your competency should be performed by the Chief of your Department first before any further consideration for evaluation by the Medical Executive Committee."[48] Despite this acknowledgment by the MEC that the Chief of Wrensford's Department – that being Odlum – would perform a clinical assessment, the court received no evidence that such a clinical assessment was performed. This supports the finding for a preliminary injunction since the loss of clinical privileges was not tied to any finding of a lack of competency on Wrensford's part.

¶63    If the court were to deny the motion for preliminary injunction, a report to the National Board will likely follow. Nothing herein is meant to suggest that RLSH should always be prevented from sending a negative report on a physician to the National Board. Instead, the court finds that in this specific instance where Wrensford's clinical privileges were suspended without proper notice and by an official who had no authority to do so, and the investigation was prompted by a concern about Wrensford's ability to work harmoniously with others, and not a finding of lack of competency, necessitates a preliminary injunction.

---

[48] Pl. Ex. 11.

¶64    The court finds that Wrensford's inability to engage in her profession in the Virgin Islands and the potential loss of her reputation, without a proper basis for the suspension of clinical privileges, are not compensable by monetary damages. As such, Wrensford has successfully demonstrated a risk of irreparable harm for which a monetary award would be inadequate.

### 3.  Harm to the Nonmoving Party

¶65    Courts must also determine whether the nonmoving party will suffer any irreparable harm if the preliminary injunction is issued in favor of the moving party. *Yusuf*, 59 V.I. at 856 (*Kos Pharms., Inc. v. Andrx Corp..*, 369 F.3d 700, 727 (3d Cir. 2004) (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990)). In considering the harm to each party, the Court "should aim to maintain the status quo, which is defined as '"the last, peaceable, noncontested status of the parties."' *Bassil*, 75 V.I. at 31 (citing *Yusuf*, 59 V.I. at 856-57 (finding that a preliminary injunction maintained the status quo by assuring that the parties retained equal control over their business pending trial)).

¶66    Here, the harm to Wrensford, if the preliminary injunction is granted, far outweighs any harm RLSH will face if the injunction is denied. The Hospital contends that granting the injunction will force RLSH to reinstate Wrensford's Hospital privileges, increasing the possibility of patient injury and exposing the Hospital to reputational damage. The court is not persuaded by the argument that Wrensford's actions or inactions on May 4 posed a significant risk to patient safety or the Hospital or caused any harm to the patient. In fact, Wrensford's supervisor, Odlum, testified that the adjustment to the patient's tubes was so minimal that he did record it in the patient's chart. The court notes, too, that when Odlum was called to the Hospital, he took the time to finish up with his office patients before going to the Hospital and arrived there approximately 1.5 hours after

he was called. Odlum testified that when he arrived at the Hospital, the patient was stable and not in distress. This leads the court to find that the patient was not in imminent danger. Testimony also demonstrates that a series of missteps likely contributed to the call for Wrensford to return to the hospital, starting with the radiologist tech's inverted CAT scan (had the images not been inverted, Wrensford would have placed the tubing on the correct side of the chest, and a second tube and attachment to wall suction would not have become necessary), followed by failure of the staff to timely find the necessary equipment to connect the tubes to the wall for suction. Lastly, evidence provided by both parties demonstrates that Wrensford's privileges were suspended not because of any failure or omission in her treatment of the patient but because she did not appoint a member to the ad hoc investigative committee. None of the evidence heard during the evidentiary hearing suggested that Wrensford's treatment of the patient was substandard. As a result, the court finds the Hospital will not suffer greater harm, or any harm, if an injunction is granted in favor of Wrensford.

### 4. Public Interest

¶67    On the element of public interest, Virgin Island courts "should seek to prevent the parties from halting 'specific acts presumptively benefitting the public … until the merits [can] be reached and a determination made as to what justice require[s].'" *Bassil*, 75 V.I. at 31 (*Yusuf*, 59 V.I. at 858 (quoting *Cont'l Grp., Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 358 (3d. Cir. 1980)). But if both a likelihood of success on the merits and irreparable harm can be shown, then the public

interest factor typically tends to favor the moving party as well. *3RC & Co.*, 63 V.I. at 557 (citing *Yusuf*, 59 V.I. at 847).[49]

¶68    In this case, the public interest factor favors Wrensford because she has demonstrated a reasonable probability of success on the merits and irreparable harm. The Hospital asserts that Wrensford's conduct fell below an applicable standard of care and reinstating her would not be in the public interest. However, nothing in the record demonstrates her skills, particularly as a general surgeon, have fallen below a standard of care. In fact, Boschulte informed Wrensford that the "investigation will not address your technical abilities as a surgeon."[50] Testimony evidence concerning the events of May 4 indicates that the patient's initial CAT scan was inverted. From the outset, Wrensford had repeatedly requested medical devices to stabilize that patient before transfer off island. When Odlum, Wrensford's supervisor, was called to the Hospital to tend to the patient, he found the patient stable and not in any distress. Odlum's treatment of the patient was so insignificant that he did not record it in the patient chart. Moreover, the public has an interest in requiring the Hospital to correctly follow the procedures outlined in the Hospital Bylaws before sanctioning a public employee. Accordingly, it's in the public's interest to grant the injunction and encourage VIGHHFC and its hospitals to adhere to the laws of the Virgin Islands and the Hospital Bylaws.

---

[49] (quoting *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)); *see also Marco St. Croix, Inc.*, 62 V.I. at 592, [WL], at *4 (the public interest weighed against issuing the injunction where the moving party failed to establish a likelihood of success and the injunction would have risked the loss of federal grant money); *Tip Top Constr. Corp.*, 60 V.I. at 727-28 (the public interest weighed in favor of the injunction where the dispute involved the award of a contract on a highway project without following the proper procurement process); *Yusuf*, 59 V.I. at 857-59 (affirming the Superior Court's finding that the public interest weighed in favor of the injunction when the moving party satisfied the other factors and the continued employment of 600 Virgin Islanders was at stake).

[50] Pl.'s Ex. 14: "The investigation will not address your technical abilities as a surgeon. It specifically will address the situation surrounding your response to request made by staff to return to the emergency room."

**CONCLUSION**

¶69    Considering the evidence offered by the Plaintiff at the evidentiary hearing on December 5, 6, and 7, the court will grant Plaintiff's Motion for Preliminary Injunction. The court weighed the four factors using a variation of the sliding scale method. The court finds that the Plaintiff demonstrated a reasonable probability of success on the merits of her claim for violation of the Virgin Islands law and violation of due process. The Plaintiff has also established that the harm to her trade and protected interests is imminent. Moreover, the court is not persuaded that any potential harm or risk to the Defendants by reinstating Plaintiff's privileges outweighs the harm to Plaintiff if the injunction were denied. Finally, the court finds that the public interest is served by encouraging VIGHHFC and its hospitals to adhere to the procedures set forth in their Bylaws.

¶70    Based on the preceding analysis, the court will grant the motion for preliminary injunction and enjoin Defendants from terminating Wrensford and enjoin Defendants from sending a negative report to the Joint Commission, pending completion of the investigation.[51] In addition, the court will also 1) order that the Hospital place Wrensford back on the payroll within twenty days and 2) permit the Hospital to again initiate a formal investigation, provided it does so within 60 days.[52]

---

[51] At some point, Wrensford asserted that the court should prevent the Hospital from continuing with a formal investigation. But were the court to preclude any further investigation and simply restore Wrensford's clinical privileges and place her back on payroll, it would preclude the hospital from doing its investigation and send a signal that the court finds that Wrensford's actions are above reproach. That is not the intent here. The court has no opinion on whether Wrensford should have been a subject of a peer review or formal investigation. But Medical Staff is subject to oversight by the Medical Executive Committee, the CMO, the CEO and the Board. It would be a grave error for this court to preclude them from performing their duties. In addition, barring further investigation could set an improper precedent for other medical staff to potentially argue they should not be subject to formal investigation.

[52] If the defendants reinitiate the formal investigation and Wrensford again declines to name a member to the ad hoc committee, the other two members of the committee shall proceed without the third member. And the committee shall make a recommendation to the Board in accordance with the bylaws. If the defendants do not re-initiate a formal investigation within sixty days, they would have waived the right to do so.

Since Wrensford's clinical privileges were wrongfully suspended, the court is of the opinion that she has demonstrated that she is entitled to have her clinical privileges immediately restored. However, the court will instead allow the defendants the discretion to decide if Wrensford's clinical privileges should be reinstated pending completion of the formal investigation. But, even if the Hospital defers reinstatement of the clinical privileges, Wrensford must be placed back on payroll and receive all other benefits associated with her employment, pending completion of the formal investigation and ultimate Board action, if any.

 An order consistent with this Memorandum Opinion shall immediately follow.

DATED: March _____1_____, 2024

**ATTEST:**
**TAMARA CHARLES**
Clerk of the Court

BY: _____
 for **LATOYA CAMACHO**
  Court Clerk Supervisor 03 / 01 / 24

**Kathleen Mackay**
Judge of the Superior Court
of the Virgin Islands